**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:

| | |
|---|---|
| **CONDOR INSURANCE LIMITED** | |
| **(IN OFFICIAL LIQUIDATION),** | **CASE NO. 07-51045-NPO** |
| **DEBTOR IN A FOREIGN PROCEEDING.** | **CHAPTER 15** |
| **RICHARD FOGERTY AND WILLIAM TAÇON** | |
| **IN THEIR CAPACITY AS THE JOINT OFFICIAL** | |
| **LIQUIDATORS OF CONDOR INSURANCE LIMITED** | **PLAINTIFFS** |
| **VS.** | **ADV. PROC. NO. 07-05049-NPO** |
| **CONDOR GUARANTY, INC., PETROQUEST** | |
| **RESOURCES, INC., HARVEY MILAM,** | |
| **BYRON TYGHE WILLIAMS, ROSS N. FULLER,** | |
| **T. ALAN OWEN, INTERCONTINENTAL** | |
| **DEVELOPMENT AND INVESTMENT** | |
| **CORPORATION, GYMNOGYPS MANAGEMENT,** | |
| **INC., AND FINPAC HOLDINGS, INC.** | **DEFENDANTS** |

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION FOR SUMMARY JUDGMENT**
**OF THE JOINT OFFICIAL LIQUIDATORS OF CONDOR INSURANCE**
**LIMITED WITH REGARD TO COUNT TWO AGAINST ROSS N. FULLER**

There came on for consideration the Motion for Summary Judgment of the Joint Official Liquidators of Condor Insurance Limited with Regard to Count Two Against Ross N. Fuller (the "Motion") (Adv. Dkt. 302)[1] and Brief in Support of Motion for Summary Judgment of the Joint Official Liquidators of Condor Insurance Limited with Regard to Count Two Against Ross N. Fuller (the "Brief") (Adv. Dkt. 303) filed by Richard Fogerty and William Taçon in their Capacity as the

---

[1] Citations to the record are as follows: (1) citations to docket entries in this adversary proceeding are cited as "(Adv. Dkt. ____)"; (2) citations to docket entries in the main case of Condor Insurance Limited, Case No. 07-51045-NPO, are cited as "(Bankr. Dkt. ____)".

duly appointed Joint Official Liquidators of Condor Insurance Limited (the "Foreign Representatives") in the above-styled adversary proceeding (the "Adversary"). Ross N. Fuller ("Fuller") did not file a response to the Motion. The Court,[2] being fully advised in the premises, finds that the Motion should be granted for the reasons set forth below.[3]

## Jurisdiction

This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P). Notice of the Motion was proper under the circumstances.

## Facts

This Motion is the second of two summary judgment motions filed by the Foreign Representatives so far in the Adversary. In their first motion,[4] filed on February 9, 2012, the Foreign Representatives sought summary judgment against Byron Tyghe Williams ("Williams") and T. Alan Owen ("Owen") (Adv. Dkt. 265), which the Court granted on April 11, 2012.[5] (Adv. Dkt. 299). In the second Motion, which is presently before the Court, the Foreign Representatives seek summary

---

[2] The main case and the Adversary were transferred by United States Bankruptcy Judge Edward R. Gaines to United States Bankruptcy Judge Neil P. Olack on February 10, 2009.

[3] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as made applicable by Federal Rule of Bankruptcy Procedure 7052.

[4] *See* Motion for Summary Judgment of the Joint Official Liquidators of Condor Insurance Limited with Regard to Count Two Against Byron Tyghe Williams and T. Alan Owen (Adv. Dkt. 265).

[5] *See* Memorandum Opinion and Order Granting Motion for Summary Judgment on Dishonest Assistance Claims of Foreign Representatives of Condor Insurance Limited against Byron Tyghe Williams and T. Alan Owen (the "Summary Judgment Opinion") (Adv. Dkt. 299).

judgment against Fuller on their dishonest assistance claim. The Foreign Representatives filed the Motion after the Court denied their request for a default judgment against Fuller, a matter that is discussed in more detail later in this Opinion.

Many of the facts underlying the dishonest assistance claim against Fuller are similar to those that formed the basis of the same claim asserted against Williams and Owen. For that reason, this Opinion mirrors to a certain extent the Summary Judgment Opinion entered against Williams and Owen. The recitation of facts below is derived mostly from the testimony of Tammy Fu, a witness for the Foreign Representatives.

1. Condor Insurance Limited ("Condor") was an insurance company domiciled in Saint Christopher (St. Kitts) and Nevis, West Indies. (Fu Decl. ¶ 12). Condor, now defunct, was primarily involved in the reinsurance business and issued special types of financial guarantees and surety bonds. (Fu Decl. ¶ 12).

2. Nearly all of Condor's assets were fraudulently transferred to Condor Guaranty, Inc. ("CGI"), Petroquest Resources, Inc. ("Petroquest"), Intercontinental Development and Investment Corporation ("IDIC"), Gymnogyps Management, Inc. ("Gymnogyps"), and Finpac Holdings, Inc. ("Finpac") through the machinations of Harvey Milam ("Milam"), Condor's president. Milam was allegedly assisted in his scheme to move Condor's assets beyond the reach of its creditors by Fuller, Williams, and Owen. (Fu Decl. ¶¶ 13, 15).

3. At all relevant times, Milam was president of Condor and CGI and was a director of Condor. (Fu Decl. ¶ 14). Fuller was Condor's consultant and/or broker. (Fu Decl. ¶ 16).

4. As of December 31, 2005, Condor's assets had a face value of over $315,000,000.00, according to its audited balance sheet. (Fu Decl. ¶ 15, Ex. 2). Of that amount, approximately

$304,000,000.00 consisted of investments (including investments in oil and gas wells) and holdings in U.S.-based companies and securities publicly traded on U.S. exchanges. (Fu Decl. ¶ 22).

5. According to Condor's correspondence in late October, 2006, and its financial statements, these assets included:

  a.  $107,834.47 in computer and office equipment;

  b.  $548,218.79 in assets owned by Aegis Shipping Limited (tools, tractors, cars, paintings, and sculptures);

  c.  $158,975.00 in rolling stock;

  d.  $1,040,500.00 in real estate;

  e.  $2,540,797.00 in cash and bank accounts;

  f.  $6,983,241.00 in premiums for insurance and reinsurance contracts earned but not collected;

  g.  $51,125,731.18 investment in oil and gas properties described as 100% of the working interest in 55 gas and oil wells, equipment, and gathering system located in Pleasants and Ritchie Counties, West Virginia, and 16 wells in Wood and Tyler Counties, West Virginia;

  h.  $15,000,000.00 investment in Petroquest International, Inc., which is described as an ongoing investment for its 30% share of rights of way and product from 4000 acres of land owned by Petroquest International, Inc. and Middle Island Creek;

  I.  $623,000.00 investment in Twin Fork Transportation, LLC, which is described as a 49% interest in Twin Fork, a pipeline and gas gathering transportation company;

  j.  $224,887,500.00 in Petroquest preferred series C stock;

  k.  $10,000,000.00 in Global Link technology preferred issue;

  l.  $2,250,150.00 in Petroquest common shares (3,000,000 at 75 cents each);

   m.  $180,000.00 in Petroquest preferred B shares; and

   n.  $360,250.00 in Petroquest preferred B shares.

(Fu Decl. ¶ 23, Ex. 3). In other correspondence, additional assets are described, including a $5,000,000.00 note receivable from Finpac, stocks held in an IFG Trust, and shares in Ashby Corporation. (Fu. Decl. ¶ 24).

  **Condor's Fall**

  6. Throughout 2005 and 2006, Condor was the subject of multiple lawsuits and collection efforts by its insureds and creditors. (Fu Decl. ¶ 17). Its ability to continue in business became uncertain. (Fu Decl. ¶ 17).

  7. Condor's economic condition was particularly weakened by a transaction undertaken primarily for Fuller's benefit. (Fu Decl. ¶ 18). Condor reinsured United Insurance's guaranty of a $9.5 million debt owed by a company controlled by Fuller. (Fu Decl. ¶ 18). In doing so, Condor pledged approximately $7 million to back up this reinsurance obligation. (Fu Decl. ¶ 18). The company controlled by Fuller subsequently defaulted on the debt, and Condor lost $7 million. (Fu Decl. ¶ 18).

  8. In 2006, Infineon Technologies AG ("Infineon"), a judgment creditor of Condor, sought permission from the Eastern Caribbean Supreme Court, High Court of Justice of Saint Christopher and Nevis, Nevis Circuit (the "Nevis High Court") to present a winding-up petition against Condor. (Fu Decl. ¶ 19). While Infineon's winding-up petition was pending, Fuller and Milam began moving Condor's assets. (Fu Decl. ¶ 19).

**CGI's Rise**

9.      In mid-November, 2006, CGI was incorporated and became a charter member of the Professional Benefits Association, a Bahamian Friendly Society.[6]  (Fu Decl. ¶ 20).  Fuller assisted Milam in setting up CGI.  On October 10, 2006, Milam sent Fuller an e-mail stating:

> [N]ow that your Am Ex bill is taken care of let's look at how to do the Bahama society deal.
>
> I need an atty. to issue us a legal opinion if *your guy* does not already have one, that this society is legal and *how we merge Condor into it in such a way as to be able to get it back out*.
>
> I have until the first on [sic] November if all else fails here.  I would guess that this '*sale*' would also give me 90 days breathing room concerning the claims issue as well.  We could send out notices of the sale to all the creditors etc. and really confuse the heck out of them. By then the SLS system will be up and running and it will be time to buy a boat.

(Fu Decl. ¶ 20, Ex. 1) (emphasis added).  There are other e-mails between Fuller and Milam dated from October 2006 to November 2006, about the Bahamian Friendly Society and the creation of CGI, the newly-formed Condor entity.  (Fu Decl. ¶ 21).  Fuller presented the idea to Williams and introduced Milam to the Friendly Society members.

10.     In late October 2006, Milam and Williams corresponded about how to "divide" assets between Condor and CGI, "a new surety company."  (Fu Decl. ¶ 25).  Some of the assets that Williams agreed to "divide" were oil and gas interests.  (Fu Decl. ¶ 25).

---

[6] According to the Foreign Representatives, CGI enjoyed an important advantage by becoming a member of a "Friendly Society." (Am. Compl. ¶ 26 n.2). "A Friendly Society is an association of members and can include various business entities.  It appears that those businesses can offer services only to members of the Friendly Society.  A business that offers insurance within a Friendly Society is apparently not subject to insurance regulations because the service can only be offered to members.  It appears that Condor Guaranty has been able to avoid insurance regulators with this maneuver, by simply having all of its insureds become members of the Friendly Society." (Id.).

11.     On November 10, 2006, Milam sent Williams an e-mail entitled "Condor's set of problems" in which Milam described three main problems he was having with Condor. (Fu Decl. ¶ 27). Milam admitted that Condor did not have enough cash to pay the outstanding claims of its insureds and further told Williams, in relevant part, that:

> [T]he claimants are going directly to winding up procedures instead of registering the judgments or filing suit in Nevis to enforce their foreign judgments. There is a hearing on November 24 and written arguments due on 15 November, even if we lose on the 24th Jeffrey will appeal, but the damage will be done.
>
> I suggest we make the move now. We can use the problems with the charter and the problem with the local registrar to justify the move and the problem with the charter to negotiate settlements. I will take a lot of heat and we will have to be prepared to fund the claims eventually but the litigation [is[ needed to clarify the charter and the ownership of the assets. If we wait and los[e] the hearing and the appeal and then do not have money to pay the claims we lose the advantage of the positive spin for being the victim of the flawed system of Nevis.

(Fu Decl. ¶ 26, Ex. 5).

12.     On November 15, 2006, the Professional Benefits Association, a Bahamian Friendly Society, granted CGI its charter. (Fu Decl. ¶ 27).

13.     Condor and CGI share several key directors, officers, and advisors, as shown in the following table:

| *Name* | *Condor* | *CGI* |
|---|---|---|
| Harvey Milam | Director & President | President |
| Albert Milam | Vice-president | Vice-president |
| Brad Cates | Compliance Officer | Secretary and/or Treasurer |
| Tracy Brandy | Secretary & Office Manager | Director |
| Hope Milam | Communications Officer | Director |
| Daniel MacMullin | Director | Director |

| Byron Tyghe Williams | Asset Manager & Preferred Shareholder Manager | Asset Manager |
| T. Alan Owen | Legal Counsel | Legal Counsel |
| Ross N. Fuller | Consultant and/or Broker | Consultant and/or Broker |

(Fu Decl. ¶ 16).

**Transfers of Condor's Assets to CGI**

14.     Shortly after receiving its charter, CGI opened bank accounts at United Bank and Bahamas Bank. (Fu Decl. ¶ 27). Condor's funds were subsequently transferred, either directly or indirectly, to CGI's bank accounts. (Fu Decl. ¶ 27).

15.     Through a "Transfer of Assets" dated November 19, 2006, many of Condor's assets were assigned or transferred to CGI including: "cash in the sum of $1,768,000.00; outstanding AR from New LTV valued at $500,000; outstanding AR from Gold Rock Creek/Stockton Fuller & Co. valued at $650,000; Petroquest restricted shares of stock totaling 3 million shares valued at $1,950,000; Petroquest Series B Convertible Preferred Stock; and a list of policies." (Fu Decl. ¶ 28).

16.     On November 24, 2006, the Nevis High Court granted Infineon permission to file a winding-up petition against Condor. (Fu Decl. ¶ 29). On November 27, 2006, Infineon initiated the insolvency proceeding against Condor by filing a winding-up petition (the "Winding-Up Petition") in the Nevis High Court. (Fu Decl. ¶ 29).

17.     Notwithstanding Infineon's filing of the Winding-Up Petition against Condor,[7] the transfers of Condor's property continued and included, in particular, Condor's interests in the oil and gas properties and in Petroquest. (Fu Decl. ¶ 30).

**Transfers of Interests in Oil & Gas Properties**

18.     In December, 2006, Milam, Williams, IDIC, and Owen conspired to "concoct" a "foreclosure" of some of Condor's oil and gas properties situated in West Virginia and Ohio. (Fu Decl. ¶ 30). The "foreclosure" was in fact a voluntary assignment by Condor to IDIC. (Fu Decl. ¶ 30). (As previously noted, Williams is president of IDIC, and Owen was IDIC's legal counsel in the transaction). Shortly after the assignment, IDIC conveyed these same oil and gas properties to CGI. The documents, which were prepared by Owen, are dated as if the transaction occurred *before* November 27, 2006, but the public records and the correspondence between the parties demonstrate that the transfers actually occurred in December 2006, *after* the Winding-Up Petition had already been filed. (Fu Decl. ¶ 30, Ex. 7; Shirley Aff. ¶ 5; Brief Ex. 11).

19.     Condor transferred to IDIC twenty-two wells in Pleasants, Ritchie, and Tyler Counties in West Virginia that were subject to an unrecorded deed of trust allegedly granted by Condor in favor of IDIC in 2005 as collateral for a loan. (Fu Decl. ¶ 31). Milam consented to a transfer of these interests in lieu of foreclosure, and they were immediately transferred to CGI,

---

[7] Section 382 of the Nevis Companies Ordinance (1999) provides:

> In a winding-up by the court, any disposition of the property of the company, including things in action, and any transfer of shares, or alteration in the status of the members of the company, made after the commencement of the winding-up, is, unless the [High Court] otherwise orders, void.

(Hare Aff. ¶ 45).

Milam's new company. (Fu Decl. ¶ 31).

20. Condor also transferred to IDIC, by assignment, fourteen gas and oil wells in Wood County, West Virginia, and interests in a pipeline and rights-of-way in Wood County, West Virginia, and Vinton County, Ohio. (Fu Decl. ¶ 32). Yet, there was no deed of trust granted by Condor in favor of IDIC with respect to those interests. (Fu Decl. ¶ 32).

21. These oil and gas interests were worth millions of dollars, according to correspondence and documents. (Fu Decl. ¶ 33). Nevertheless, Milam consented to these transfers in lieu of foreclosure when Condor's purported debt to IDIC (allegedly secured by the interests) was only $727,273.68. (Fu Decl. ¶ 33, Ex. 8).

22. The value of the assets transferred by Condor to CGI during this time frame are evidenced by the "Portfolio Transfer (July-December)" provided by Milam, who explained that virtually all of Condor's assets and business had been transferred to CGI. (Fu Decl. ¶ 34, Ex. 9).

23. In addition to the transfers of Condor's oil and gas properties, Condor's interest in Petroquest was transferred after the Winding-Up Petition was filed. (Fu Decl. ¶ 35). In a letter dated January 17, 2007, to Interwest Transfer Co., Inc., Petroquest directed that the share certificate for 2,500,000 shares of Series C Preferred Stock in Petroquest (that had previously been issued to Condor) be cancelled and that the shares be returned to Treasury, with 2,000,000 shares of Preferred C Stock being simultaneously reissued to CGI. Additionally, the Portfolio Transfer indicates that 3,000,000 shares of Petroquest common stock were transferred to CGI. (Fu Decl. ¶ 35, Ex. 9).

24. On May 18, 2007, the Nevis High Court issued an order appointing the Foreign Representatives as joint liquidators to "take into their custody, or under their control, all the property and things in action (including any assets or books and papers) to which Condor is, or appears to be,

entitled . . . . [and d]o all such other things as may be necessary for winding-up the affairs of the company and distributing its assets." (Bankr. Dkt. 35).

25. Because the Foreign Representatives believed they had identified assets of Condor in the State of Mississippi, they commenced a chapter 15 case in this Court by filing a Verified Petition for Recognition of Foreign Main Proceeding and Related Relief (Bankr. Dkt. 2) on July 26, 2007.

26. The Court entered an Order Granting Recognition of Foreign Main Proceeding and Related Relief on August 21, 2007, pursuant to the provisions of 11 U.S.C. § 1517(b)(1). (Bankr. Dkt. 35).

27. On November 20, 2007, the Foreign Representatives initiated the Adversary by filing the Original Complaint (the "Original Complaint") (Adv. Dkt. 1), seeking the Court's assistance in recovering Condor's assets under Nevis law. The Original Complaint named only two defendants, CGI and Petroquest, and alleged causes of action grounded in Nevis law.

28. The value of the oil and gas properties that were not transferred to IDIC in December, 2006, was carried on Condor's balance sheet. (Fu Decl. ¶ 35). However, legal title to the wells appears actually to have been held by Petroquest, which then transferred the title to Owen in December 2007 (after the Adversary was commenced but before Owen was named as a defendant). (Fu Decl. ¶ 35).

29. On April 21, 2008, the Foreign Representatives filed an Amended Complaint (the "Amended Complaint") (Adv. Dkt. 115) in the Adversary in which they added claims against the following individuals and entities: Fuller, Williams, Owen, Milam, IDIC, Gymnogyps, and Finpac. The new defendants were added as a result of information obtained by the Foreign Representatives

through the discovery process.

30. Fuller, acting *pro se*, filed an Answer to Complaint by Ross Fuller Individually and as Secretary-Treasurer of Finpac Holdings Inc. ["Defendant"] (the "Answer")[8] (Adv. Dkt. 139) on June 12, 2008.

31. The Court entered an Order (Adv. Dkt. 155) on July 8, 2008, striking the Answer as it pertained to Finpac. See Turner v. Am. Bar Ass'n, 407 F. Supp. 451, 476 (D.C. Ala. 1975) ("Corporations and partnerships, both of which are fictional legal persons, obviously cannot appear for themselves personally."). The Court, however, did not strike the Answer as it pertained to Fuller.

32. After filing the Answer, Fuller did not submit any other pleadings or motions and has not appeared at any status conferences or hearings.

33. The Foreign Representatives filed an Application for Entry of Default Against Ross N. Fuller (Adv. Dkt. 182) on August 6, 2010, which the Clerk of the Bankruptcy Court (the "Clerk") granted on August 25, 2010. (Adv. Dkt. 193).

34. The Foreign Representatives filed the Motion of Richard Fogerty [and] William Taçon in their Capacity as the Joint Official Liquidators of Condor Insurance Limited for Default Judgment as to Ross N. Fuller for Failure to Timely Answer, Plead or Otherwise Defend (the "Default Judgment Motion") (Adv. Dkt. 221) on August 8, 2011.

35. A hearing on the Default Judgment Motion was held on February 2, 2012. The Court denied the Default Judgment Motion on the ground that Rule 55 of the Federal Rules of Civil Procedure did not authorize entry of a default against Fuller who had filed an Answer in the

---

[8] Fuller's Answer is unsworn and, therefore, is not competent to serve as evidence in opposition to the Motion. Nissho-Iwai Am. Corp. v. Kline, 845 F.2d 1300, 1306 (5th Cir. 1988) ("[A]n unsworn affidavit is incompetent to raise a fact issue precluding summary judgment.").

proceeding.[9] (Adv. Dkt. 276). The Court also vacated the entry of default entered by the Clerk against Fuller.

36. On April 11, 2012, the Court rendered the Summary Judgment Opinion, accompanied by the Final Judgment as to Byron Tyghe Williams and T. Alan Owen (the "Final Judgment") (Adv. Dkt. 300). The Final Judgment ordered Williams and Owen to pay the Foreign Representatives damages in the amount of $314,313,191.

37. The Motion *sub judice* was filed by the Foreign Representatives on April 13, 2012. In the Motion, the Foreign Representatives seek summary judgment against Fuller on the dishonest assistance claims alleged in Count Two of the Amended Complaint. (Am. Compl. ¶ 56-62). Specifically, they request damages arising from the alleged dishonest participation and knowing assistance that Fuller provided Milam in his fraudulent transfers of Condor's assets and in his breach of fiduciary duty to Condor.

38. As of February 2, 2012, the Foreign Representatives have recovered $1,008,430.00 and anticipate recovering an additional $330,000.00. (Fu Decl. ¶ 38). Thus, according to the Foreign Representatives, Condor's damages are $314,313,191.00. (Fu Decl. ¶ 38).

## Discussion

The Court must determine if the evidence presented establishes the existence of a genuine dispute as to whether Fuller knowingly and dishonestly assisted Milam in planning and executing fraudulent transfers of Condor's assets in violation of Milam's fiduciary duty to Condor.

---

[9] *See* Memorandum Opinion and Order (1) Denying Motion of Richard Fogerty [and] William Taçon in their Capacity as the Joint Official Liquidators of Condor Insurance Limited for Default Judgment as to Ross N. Fuller for Failure to Timely Answer, Plead or Otherwise Defend and (2) Setting Aside Clerk's Entry of Default against Ross N. Fuller (Adv. Dkt. 276).

A.  **Rule 56 Summary Judgment Standard**

Rule 7056 of the Federal Rules of Bankruptcy Procedure incorporates the summary judgment standard established in Rule 56 of the Federal Rule of Civil Procedure.[10]  Summary judgment is appropriate under Rule 56(a) when viewing the evidence in the light most favorable to the non-moving party, the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see* Celotex Corp.v. Catrett, 477 U.S. 317, 322- 23 (1986).

Defense of a proper summary judgment motion requires more from the non-moving party than mere allegations or denials of his pleadings.  Rule 56(e) provides:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . .

FED. R. CIV. P. 56(e)(2).  Thus, once the moving party has made its required showing, the non-moving party must go beyond the pleadings and by his own affidavits, depositions, answers to interrogatories, or admissions demonstrate specific facts to establish there is a genuine issue for trial. Celotex, 477 U.S. at 324.  Ultimately, the role of the court is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 590 (1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

---

[10] Pursuant to the Rules Enabling Act, 28 U.S.C. § 2072, Rule 56 of the Federal Rules of Civil Procedure was amended, as of December 1, 2010.  The amendment did not change the standard for granting summary judgment.  *See* FED. R. CIV. P. 56 advisory committee's note to 2010 Amendments ("The standard for granting summary judgment remains unchanged.").

**B.     Nevis Law**

The dishonest assistance claim of the Foreign Representatives against Fuller is based on alleged violations of Nevis law. To prove the relevant principles of Nevis law,[11] the Foreign Representatives rely upon the testimony of William Richard Hare, whose affidavit is attached as exhibit 2 to the Brief (Adv. Dkt. 303-2). Hare is a barrister of the Eastern Caribbean Supreme Court and a partner in the law firm of Forbes Hare in Tortola, British Virgin Islands. (Hare Aff. ¶¶ 1-2).

According to Hare, the Federation of Saint Christopher (St. Kitts) and Nevis is an independent nation that was previously a colony of the United Kingdom. (Hare Aff. ¶ 4). Nevis law is based on English common law, augmented by local statutes (Hare Aff. ¶ 4). Cases rendered by the Nevis High Court are appealed to the Eastern Caribbean Court of Appeal and from there, to the Judicial Committee of the Privy Council in London (the "Privy Council") (Hare Aff. ¶ 5). Thus, the decisions of the Privy Council are binding on the Nevis High Court.

As to the claims that are the subject of the Motion, English common law (and, thus, Nevis law) recognizes a cause of action against a third party who dishonestly assists a fiduciary in committing a breach of his fiduciary duty. (Hare Aff. ¶ 31). Such a cause of action requires proof of the breach of a fiduciary duty.

A fiduciary relationship is akin to the relationship that exists between a trustee and the beneficiary of a trust. (Hare Aff. ¶ 16). A director of a company, which is the position held by Milam at Condor, shares some of the same attributes of a trustee, especially with respect to assets that

---

[11] In determining foreign law, Rule 44.1 of the Federal Rules of Civil Procedure states that "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." FED. R. CIV. P. 44.1. Rule 9017 of the Federal Rules of Bankruptcy Procedure makes Rule 44.1 of the Federal Rules of Civil Procedure applicable to adversary proceedings. FED. R. BANKR. PROC. 9017

are in his hands or under his control. (Hare Aff. ¶ 18). A director has an irreducible fiduciary duty to act in good faith. (Hare Aff. ¶ 18). Such a duty is generally described as a director's duty to exercise his powers *bona fide* in the company's best interests. (Hare Aff. ¶ 18).

Liability under Nevis law for dishonest assistance is premised on the dishonesty of the accessory to the fiduciary's wrong. Whether the primary breach of duty by the fiduciary was the result of the fiduciary's own dishonest conduct is irrelevant in determining the liability of the accessory. Instead, liability depends upon proof that his state of mind was dishonest in assisting in the breach. However, his state of mind may consist in knowledge that people with normally-accepted standards of honest conduct would regard his assistance as dishonest. (Hare Aff. ¶¶ 31-32). According to the Privy Council, "[a]lthough a dishonest state of mind is a subjective mental state, the standard by which the law determines whether it is dishonest is objective. If by ordinary standards a defendant's mental state would be characterized as dishonest, it is irrelevant that the defendant judges by different standards." Barlow Clowes Int'l Ltd (In Liquidation) v. Eurotrust Int'l Ltd, [2005] UKPC 37. In other words, the fact that the accessory did not view his own conduct as dishonest does not render him beyond the *mens rea* element for liability. Finally, an accessory who dishonestly assists another in the breach of his fiduciary duty is liable for the losses resulting from such assistance. (Hare Aff. ¶ 35).

C.  **Dishonest Assistance Claims Against Fuller**

The transfers of the bulk of Condor's property that were initiated by Milam at a time when Condor was insolvent, or at least on the brink of insolvency, and so near the date when the Winding-Up Petition was filed, constituted transfers of assets in breach of Milam's fiduciary duty to Condor under Nevis law. In his capacity as a director and president of Condor, Milam owed Condor a

fiduciary duty to act *bona fide* in Condor's best interests. The evidence presented by the Foreign Representatives, however, overwhelmingly showed that Milam ignored the best interests of Condor and its creditors and breached his fiduciary duty to Condor. He transferred assets of Condor when Condor was either insolvent or of doubtful solvency.

Significantly, one of the transactions that weakened Condor's economic condition was undertaken primarily for Fuller's benefit. Condor reinsured a $9.5 million debt owed by a company controlled by Fuller. When that company subsequently defaulted on the debt, Condor lost $7 million.

The evidence further showed that Fuller played a major role in planning Condor's financial demise. At a time when Condor was subject to multiple lawsuits and collection efforts by its insureds and creditors, Fuller corresponded with Milam via email about the establishment of a new entity (CGI) into which Condor could be merged "in such a way as to be able to get it back out." (Adv. Dkt. 303, Ex. 5). Fuller was a consultant to Condor and its investment banker. He was aware of Condor's financial difficulties and of Milam's intent to "confuse the heck out of [Condor's creditors]." (Id.)

While Fuller worked to get the new entity established, Milam determined which of Condor's assets would be transferred to CGI. (Adv. Dkt. 303, Ex. 8). Then, two days after CGI was formed, Milam wrote Williams that "claimants [of Condor] are going directly to winding up procedures instead of registering the judgments or filing suit in Nevis to enforce their foreign judgments," and suggested to Williams that *"we make the move now. . . . us[ing] the problems with the charter and the problem with the local registrar to justify the move and the problem with the charter to negotiate settlements."* (Adv. Dkt. 303, Ex. 9) (emphasis added).

Fuller's assistance was dishonest by the standards of reasonable and honest people. His dishonesty is apparent or, in the alternative, is implied from the fact that he knew that Condor was insolvent or on the brink of insolvency and that the transfers would leave Condor without assets to satisfy its creditors and, moreover, that the transfers were actually intended to have that effect.

The Court reaches these findings based on the unrebutted evidence presented by the Foreign Representatives. To avoid summary judgment under Rule 56, Fuller had the burden of going beyond the denials in his Answer to the Amended Complaint and presenting sufficient evidence setting forth facts demonstrating the need for trial. He failed to do so. Accordingly, the Court finds that Fuller dishonestly assisted Milam in breaching his fiduciary duty to Condor in violation of Nevis law. As a result, Fuller is liable for the losses resulting from his dishonest participation in Milam's scheme. The Court further finds that there is no genuine dispute that the amount of damages that the Foreign Representatives are entitled to recover is $314,313,191.00.[12]

## Conclusion

The Court concludes that the Motion should be, and is hereby, granted in favor of the Foreign Representatives. In accordance with Rule 7058 of the Federal Rules of Bankruptcy Procedure, the

---

[12] The Foreign Representatives ask the Court to hold Fuller "jointly and severally" liable, together with other defendants against whom default judgments have been entered. (Adv. Dkt. 271, 273, 275). The Foreign Representatives did not offer proof of the scope of multiple liability under Nevis law. In the absence of such proof, the Court declines to award the relief requested at this time.

Court will enter a separate judgment in the amount of $314,313,191.00 against Fuller consistent with this Memorandum Opinion.

SO ORDERED.

_____
Neil P. Olack
United States Bankruptcy Judge
Dated: May 10, 2012